[No. F062517. Fifth Dist. Dec. 12, 2012.]

THE PEOPLE, Plaintiff and Respondent, v.
ANDREW FRANCISCO VELASQUEZ, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I.A. and II. through IV. of the Discussion.

## Counsel

Sharon G. Wrubel, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and Jamie A. Scheidegger, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**CORNELL, Acting P. J.**—Andrew Francisco Velasquez fired a handgun 10 times at an occupied residence. A jury convicted him of numerous crimes and the trial court sentenced him to 38 years to life in prison. Among the convictions were five counts of assault with a firearm, in violation of Penal

Code section 245, subdivision (a)(2).[1] Velasquez challenges four of these convictions due to erroneous jury instructions and as unsupported by substantial evidence.

The remainder of Velasquez's arguments relate to his sentence. First, he challenges his sentence as violating his constitutional right to be free from cruel and unusual punishment. Next, he argues his sentence for possession of a loaded firearm (former § 12031, subd. (a)(1))[2] must either be stayed pursuant to section 654 or vacated because the trial court relied on inappropriate factors in imposing an aggravated term. Finally, he argues the sentence on a second conviction for violating former section 12031, subdivision (a)(1) must be stayed pursuant to section 654.

We conclude some of Velasquez's arguments have merit. First, we agree the four assault with a firearm convictions he challenges must be reversed because of a prejudicial error in instructions. Second, we agree the trial court erred in sentencing Velasquez on the second former section 12031, subdivision (a)(1) conviction, but not for the reason cited by Velasquez. Instead, we will order this conviction vacated because both former section 12031, subdivision (a)(1) convictions were based on the same act, and thus there can be only one conviction. The remainder of the judgment, including the sentence, is affirmed.

### FACTUAL SUMMARY

Adolfo Hurtado returned home from work about 9:45 p.m. on the day of the shooting. He was in his bedroom asleep when he heard knocking on his bedroom door and was told by a family member that he had heard gunshots and the family was afraid he had been shot. Adolfo's bedroom was located at the back of the residence. Inside the residence at the time were Adolfo's mother, father, and his brother Oliverio Hurtado. Adolfo went to the front yard of the house. The only person he saw outside was his brother Juan Hurtado. He did see a car go by with its lights off. Adolfo thought it was a small Honda.

The house sustained a broken window near where Adolfo's mother was sleeping in the garage and a hole in the wall near the kitchen area. Five separate bullet holes were found in the structure. Ten 9-millimeter shell casings and one intact cartridge were located in the street about 100 feet from the residence. Three bullet fragments were located near the structure.

---

[1] All further statutory references are to the Penal Code unless otherwise stated.

[2] This statute was repealed effective January 1, 2012 (Stats. 2010, ch. 711, § 4) and reenacted without substantive change in section 25850, subdivision (a) (Stats. 2010, ch. 711, § 6).

Adolfo admitted he hung around with "Northerners" in high school because most people in his high school were Northerners (Nortenos). But by the time of the shooting, he and his brother Leo Hurtado, Jr.,[3] hung out with "Southerners" (Surenos).

Leo Hurtado, Sr., was in his bedroom watching television when the shooting occurred. His wife was in the garage lying on a bed.

Juan was in the living room of the house with his brother Oliverio when he heard the gunshots. Juan went outside to see what was going on. He heard two car doors close and then saw a black Honda depart. The vehicle had a loud exhaust. Juan also was able to identify the vehicle for the police later that night because of the distinct taillights on the vehicle.

Ali Machuca was in front of her house on the night in question when she heard gunshots. A dark vehicle sped by her house a short while later. Machuca went to the victim's house to make sure no one had been hurt. While there she heard a vehicle that sounded like the same car that had passed by earlier on a nearby street.

Officer Eliseo Mendez heard numerous gunshots while on patrol in the area. Within minutes a black Honda Civic driving at a high rate of speed passed in front of him, failed to stop for a stop sign, turned off its headlights, and then drove into a residential driveway. The passenger exited the vehicle as Mendez exited his patrol vehicle. Mendez ordered the passenger to stay inside the vehicle, but the passenger proceeded to the front door of the residence. Mendez ordered the passenger to show his hands. When the passenger refused, Mendez shot the passenger with his Taser. The passenger was Velasquez. Velasquez dropped a nine-millimeter handgun and a loaded magazine when shot with the Taser. A second magazine for the gun was found later in Velasquez's pocket.

Mendez later determined the driver of the vehicle was Glenn Martinez, who also was arrested that night.

Martinez was the prosecution's star witness. Velasquez is Martinez's cousin. Martinez was driving his mother's Honda Civic on the night of the shooting. He had gone to the house of his cousin, Ruben Herrera. Velasquez also was there. Around 9:30 p.m., Velasquez asked Martinez for a ride to "drop something off." They had driven for a short distance when Velasquez asked Martinez to turn right on the street where the Hurtados lived. Velasquez

---

[3] Velasquez's father and brother have the same first name, Leo. To avoid any confusion, we will identify father as Leo, Sr., and brother as Leo, Jr.

told Martinez to stop along the side of the road. Velasquez exited and walked towards the back of the vehicle. Martinez then heard some gunshots that sounded close by. Seconds later Velasquez reentered the vehicle and told Martinez, "Just get the fuck out of here." Martinez never saw Velasquez with a gun. Martinez drove back to Herrera's house. They were pulled over by a police officer just as they arrived at Herrera's house.

In exchange for his testimony, Martinez accepted an agreement that would result in a 12-year prison sentence.

In his statement to the police, Velasquez admitted that he associated with the "Northern Structure" prison gang.

Gunshot residue tests performed on Velasquez and Martinez five hours after the incident were negative. Testing was able to determine that one of the bullet fragments shared the same characteristics as the handgun recovered from Velasquez, but there was not enough individual detail for an identification. Five of the cartridge cases found at the scene were extracted from this handgun and most likely were fired from the handgun. The other cartridge cases were similar, but there was not enough detail to permit identification.

The prosecution also offered testimony to establish that Leo, Jr., and Adolfo were members of a Sureno criminal street gang. The expert opined that Oliverio associated with "Southern" gangs, and Velasquez was an active member of the Norteno criminal street gang. Finally, the expert opined the crime was committed for the benefit of the Norteno criminal street gang.

Velasquez presented witnesses who attempted to provide him with an alibi for the time of the shooting.

## PROCEDURAL SUMMARY

The third amended information charged Velasquez with shooting at an inhabited dwelling (§ 246) (count 1), shooting from a motor vehicle (former § 12034, subd. (c)) (count 2), one count of assault with a firearm for each of the five people in the residence at the time of the shooting, for a total of five counts (§ 245, subd. (a)(2)) (counts 3–7), grossly negligent discharge of a firearm (§ 246.3, subd. (a)) (count 8), carrying a loaded firearm by a gang member (former § 12031, subd. (a)(1), (2)(C)) (count 9), misdemeanor carrying a loaded firearm (former § 12031, subd. (a)(1), (2)(G)) (count 10), and resisting arrest (§ 148, subd. (a)(1)) (count 11). In addition, the following enhancements were alleged: (1) the offense was committed for the benefit of a criminal street gang within the meaning of section 186.22, subdivision (b)(1)(A) through (C) and/or (d) (counts 1–8 and 10), and (2)

Velasquez personally discharged a firearm within the meaning of section 12022.53, subdivision (c) (count 1), personally used a firearm within the meaning of section 12022.53, subdivision (b) (count 1), and personally used a firearm within the meaning of section 12022.5, subdivisions (a) and (d) (counts 3–7).

The jury convicted Velasquez of the violations alleged in counts 1, 3, 4, 5, 6, 7, 9, 10 and 11.[4] In addition, the jury found true the following enhancements: (1) the crimes were committed for the benefit of a criminal street gang (counts 1, 3–7, and 10); (2) Velasquez personally discharged a firearm within the meaning of section 12022.53, subdivision (c) (count 1); and (3) Velasquez personally used a firearm within the meaning of section 12022.5, subdivisions (a) and (d) (counts 3–7).

The trial court sentenced Velasquez to an indeterminate term of 15 years to life on count 1 and a determinate term of 23 years consisting of an aggravated term of three years on count 9 and 20 years for the section 12022.53, subdivision (c) enhancement on count 1. The determinate sentence was ordered to run consecutively to the indeterminate sentence. The sentences on the remaining counts were either stayed pursuant to section 654 or imposed concurrently.

## DISCUSSION

### I. *Assault with a Firearm*

Velasquez was charged with five counts of assault with a firearm, one for each person inside the residence at the time of the shooting. The prosecution's theory was that Velasquez shot at the garage 10 times, thus putting each person inside the house in jeopardy. Count 3 alleged the victim was Juan, count 4 alleged the victim was Oliverio, count 5 alleged the victim was Adolfo, count 6 alleged the victim was Maria, and count 7 alleged the victim was Leo, Sr.

Velasquez concedes that he has no grounds to challenge the count involving Maria since the shots were directed at the garage and Maria was inside the garage at the time of the shooting. He does, however, argue the remaining four counts must be reversed for two reasons. First, he asserts the convictions were not supported by substantial evidence because there was no evidence these four victims were in an area of the house that put them at risk for being struck by a bullet. Second, he argues the instructions improperly allowed the jury to convict him for these counts simply because Maria was at risk of being struck by a bullet.

---

[4] The prosecution dismissed counts 2 and 8 before the matter was submitted to the jury.

A. *Sufficiency of the Evidence**

· · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · ·

B. *Jury Instrucitons*

The trial court instructed the jury with CALCRIM No. 875. The relevant portion of the instruction stated:

"To prove that the defendant is guilty of this crime, the People must prove that:

"1. The defendant did an act with a firearm that by its nature would directly and probably result in the application of force to a *person*;

"2. The defendant did that act willfully;

"3. When the defendant acted, he was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force *to someone*; AND

"4. When the defendant acted, he had the present ability to apply force with a firearm to a *person*." (Italics added.)

Velasquez points out that five counts of assault with a firearm were charged, with each count identifying a different member of the Hurtado family as the victim. He argues that because the instruction referred to application of force *to a person or to someone*, the jury could have believed that if any member of the family was at risk of injury, then the People adequately proved each count of assault. Since Maria was at risk because of her location in the garage, Velasquez asserts the jury could have found him guilty on these four counts of assault without considering whether his act of shooting at the residence would directly and probably result in the application of force to the victim named in each count.

While, as the People argue, CALCRIM No. 875 is a correct statement of the law, the potential for juror confusion is obvious. One cannot assault John Doe, when the defendant aimed at Tom Smith, if John Doe was standing hundreds of feet behind the defendant when the defendant shot the firearm (assuming the defendant's aim was reasonably accurate, but did not result in injury to Tom Smith). Tom Smith was the victim of an assault because the act in this hypothetical would directly and probably result in application of force

---

*See footnote, *ante*, page 1170.

to him. But John Doe, who was hundreds of feet away in the opposite direction, unthreatened and unharmed, was not a victim of assault because the defendant did not commit an act that "by its nature would directly and probably result in application of force" to John Doe.

■ The jury could have determined that·when Velasquez shot at the residence, the result was a direct and probable application of force to Maria because she was located in the area at which the shots were aimed. The jury also could have concluded that none of the other members of the household were in any danger of being hit by a bullet because of their location in the residence. Indeed, there was evidence to support such a conclusion, although not necessarily compelling the conclusion. Nonetheless, by following the letter of the instruction, the jury may have found Velasquez guilty of assaulting the other four individuals because firing the shots resulted in a direct and probable application of force to a *person* (Maria). If so, Velasquez was convicted of four counts of assault, even though the prosecution failed to prove beyond a reasonable doubt the elements of the offense.[5]

■ "The Due Process Clause of the Fourteenth Amendment denies States the power to deprive the accused of liberty unless the prosecution proves beyond a reasonable doubt every element of the charged offense. [Citation.] Jury instructions relieving States of this burden violate a defendant's due process rights. [Citations.] Such directions subvert the presumption of innocence accorded to accused persons and also invade the truth-finding task assigned solely to juries in criminal cases." (*Carella v. California* (1989) 491 U.S. 263, 265 [105 L.Ed.2d 218, 109 S.Ct. 2419].) Because the error violated Velasquez's constitutional rights, we must review the record to determine whether the error was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824].)

Our review of the record did not reveal any instruction that may have clarified the requirement that each victim must have been subject to the application of force. Nor did the argument of the attorneys address the vagueness of this instruction. Indeed, while the issue was raised by defense counsel, no one explained to the jury that it must conclude beyond a reasonable doubt that the bullets fired by Velasquez would directly and probably result in application of force to the victim named in each count.

Accordingly, we conclude the error was prejudicial, and the convictions in counts 3, 4, 5, and 7 must be reversed.

---

[5] Because this error affected Velasquez's substantial rights, we reject the People's assertion that the issue was forfeited. (§ 1259.)

II.–IV.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The conviction for violating former section 12031, subdivision (a)(1) and (2)(G)[7] in count 10 is vacated. The convictions for assault with a firearm in counts 3, 4, 5, and 7 are reversed. The judgment is affirmed in all other respects. The matter is remanded to the trial court for issuance of a new abstract of judgment and for retrial of counts 3, 4, 5, and 7 if the People should choose to do so.

Gomes, J., and Franson, J., concurred.

Appellant's petition for review by the Supreme Court was denied March 20, 2013, S208047.

---

*See footnote, *ante*, page 1170.

[7] The abstract of judgment incorrectly refers to subdivision (a)(2)(C).